IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| JAMES CUMMINS, | ) | |
| | ) | |
| Plaintiff, | ) | No. CV04-1028 JAJ |
| | ) | |
| vs. | ) | |
| | ) | **DEFENDANT'S REPLY TO** |
| THE ARCHDIOCESE OF DUBUQUE, | ) | **PLAINTIFF'S BRIEF IN RESISTANCE** |
| | ) | **TO SUPPLEMENTAL MOTION** |
| Defendant. | ) | **FOR SUMMARY JUDGMENT** |
| | ) | |

COMES NOW, Defendant, The Archdiocese of Dubuque ("the Archdiocese"), by and

through its attorneys, and for its Reply to Plaintiff James Cummins' ("Cummins") Brief in

Resistance to Supplemental Motion for Summary Judgment states:

## INTRODUCTION AND SUMMARY OF REPLY

Cummins filed a five-count lawsuit against the Archdiocese on June 14, 2004 in the

United States District Court for the Northern District of Iowa. See Complaint. The Archdiocese

filed a Motion for Summary Judgment on July 20, 2005. On August 9, 2005, Cummins filed an

amended complaint which set forth additional allegations against the Archdiocese, including a

claim for civil conspiracy. See Amended Complaint, ¶¶ 29-37, 39, 75-80. The Archdiocese could

not address the civil conspiracy claim in its original Motion for Summary Judgment and filed its

Supplemental Motion for Summary Judgment to address Count VI and to advance arguments

supporting a grant of summary judgment on Counts IV and V of Cummins' Complaint.

Cummins has resisted the Supplemental Motion for Summary Judgment, and the Archdiocese

now submits its Reply to Cummins' Resistance.

In addition to the reasons advanced in the Archdiocese's Motion for Summary Judgment filed on July 20, 2005, the Archdiocese is further entitled to summary judgment on Count IV of Cummins' Complaint because there is no evidence that a fiduciary relationship existed between the Archdiocese and Cummins. The Archdiocese is entitled to summary judgment on Cummins' claims for negligent hiring, retention, supervision, and documenting because those claims are barred by the religion clauses of the First Amendment of the United States Constitution and Article I, Section 3 of the Iowa Constitution. The Archdiocese is entitled to summary judgment on Cummins' duty to warn claim because it did not have a special relationship with Cummins and had no knowledge, either actual or constructive, of the prior misconduct of Father Roach or Father Peters. The Archdiocese is entitled to summary judgment on Count VI of Cummins' Complaint because Cummins has not produced evidence to establish the elements of a civil conspiracy claim.

## ARGUMENT

**I.     THE ARCHDIOCESE DID NOT OWE A FIDUCIARY DUTY TO CUMMINS.**

Count IV of Cummins' complaint contains claims for breach of fiduciary duty based on the direct and vicarious liability of the Archdiocese. To the extent Cummins seeks to hold the Archdiocese vicariously liable for the conduct of Father Roach and Father Peters, the Archdiocese reasserts and incorporates by reference the arguments of its Brief in Support of its Motion for Summary Judgment, its Reply Brief, and its Brief in Support of its Supplemental Motion for Summary Judgment. This reply will only address Cummins' claim for direct liability based on a breach of fiduciary duty by the Archdiocese.

A necessary predicate to any breach of fiduciary duty claim is the existence of a fiduciary

relationship. Stotts v. Eveleth, 688 N.W.2d 803, 811 (Iowa 2004)(refusing to find a breach of fiduciary duty where plaintiff failed to establish the existence of a fiduciary relationship). Under Iowa law, a fiduciary relationship exists when one person "is under a duty to act for the benefit of another as to matters within the scope of the relationship." Stotts, 688 N.W.2d at 811. A fiduciary relationship will arise when a person places confidence, trust, or reliance upon the judgment, guidance, or advice of another. Id. Other indicia of a fiduciary relationship include the acting of one person for another; the having and exercising of influence over one person by another; and the dependence of one person on another. See Doe v. Hartz, 52 F.Supp.2d 1027, 1059 (N.D. Iowa 1999).

Iowa's courts have not addressed the issue of whether a fiduciary relationship can exist between an individual parishioner and a clergy member or diocese, and decisions from other jurisdictions show there is a split in authority regarding whether such a relationship can exist. Id. at 1059-60. A number of courts have held that a fiduciary relationship between an individual parishioner and a clergy member or diocese cannot exist under any circumstances. See e.g., Dausch v. Ryske, 52 F.3d 1425, 1428-29 (7th Cir. 1994)(holding that Illinois law did not recognize a cause of action for breach of fiduciary duty against clergy or religious organizations); Schmidt v. Bishop, 779 F.Supp. 321, 325-36 (S.D.N.Y. 1991) (refusing to recognize a cause of action for breach of fiduciary duty against clergy member); H.R.B. and B.B. v. J.L.G., 913 S.W.2d 92 (Mo. Ct. App. 1995)(holding that recognition of breach of fiduciary duty claims against clergy or religious organizations would lead to excessive entanglement in religious matters); Schieffer v. Catholic Archdiocese of Omaha, 508 N.W.2d 907, 912 (Neb. 1993)(refusing to recognize cause of action for breach of fiduciary duty against a priest and

diocese) . Other jurisdictions have held that the relationship can exist only under special, limited circumstances. See Doe v. Hartz, 52 F.Supp.2d at 1059 (holding that a fiduciary relationship between a parishioner and a clergy member or diocese will only exist under appropriate circumstances); Doe v. Norwich Roman Catholic Diocesan Corporation, 268 F.Supp.2d 139, 149 (D. Conn. 2003)(noting that fiduciary relationships between a diocese and parishioner have only been found to exist in unique circumstances).

In Doe v. Hartz, a federal case which interpreted and applied Iowa law, the plaintiff claimed she had a fiduciary relationship with the Diocese of Sioux City, and that the diocese breached its fiduciary duty to her by failing to prevent a priest's misconduct. 52 F.Supp.2d at 1058. In answering the preliminary question of whether a fiduciary relationship could exist between an individual parishioner and a diocese, the court concluded that Iowa law appeared to allow for such a relationship "in appropriate circumstances." Id. at 1059. The court then determined that, as the plaintiff had failed to allege that she ever had any direct relationship or contact with the diocese, there was not an adequate basis to find a fiduciary relationship between the plaintiff and the diocese. Id. At 1064. The court further held that the status of the diocese within the church hierarchy was insufficient to establish a fiduciary relationship. Id.

Cummins alleged the Archdiocese entered into a fiduciary relationship with him by undertaking his religious instruction and spiritual and emotional counseling. See Amended Complaint, ¶ 64. In his Resistance, Cummins relies on the affidavit of Thomas Doyle and cases from other jurisdictions to argue that the appropriate circumstances are present to support the existence of a fiduciary relationship between himself and the Archdiocese. A brief review of the cases defining the "appropriate circumstances" for imposing a fiduciary relationship will show

that the assertions of Mr. Doyle regarding Cummins' relationship with the Archdiocese are, as a matter of law, insufficient to support the existence of a fiduciary relationship.

**A.     What Are The "Appropriate Circumstances" For Finding A Fiduciary Relationship Between An Individual Parishioner And A Diocese?**

   *1.     Cases where the appropriate circumstances for finding the existence of a fiduciary relationship between an individual parishioner and diocese were not present.*

Besides <u>Doe v. Hartz</u>, there are several cases where courts found that the "appropriate circumstances" for finding the existence of a fiduciary relationship were not present. In <u>Doe v. Norwich Roman Catholic Diocesan Corp.</u>, the Federal District Court of Connecticut recognized that a fiduciary relationship between a parishioner and diocese could exist under unique circumstances. 268 F.Supp.2d at 149. The court dismissed the plaintiff's claim for breach of fiduciary duty against a diocese because the plaintiff failed to allege sufficient facts indicating a unique degree of trust and confidence existed between herself and the diocese. <u>Id</u>.

The New York Supreme Court held that a parishioner seeking to establish the existence of a fiduciary relationship "may not merely rely on the church's status in general, but must come forward with facts demonstrating that his or her relationship with the institution was somehow unique or distinct from the institution's relationship with other parishioners generally. <u>Doe v. Holy See (State of Vatican City)</u>, 17 A.D.3d 793, 795 (N.Y. Sup. Ct. 2005). In support of their claims for breach of fiduciary duties, the plaintiffs in <u>Doe v. Holy See</u> alleged that the defendant diocese held itself out as a religious educational institution which provided pastoral and instructional services to the plaintiffs. <u>Id</u> at 795-96. As these allegations failed to indicate how plaintiffs' relationships with the diocese was any different from its relationship with other

parishioners, the plaintiffs failed to demonstrate the existence of fiduciary relationships between themselves and the diocese. Id. at 796.

In Bryan R. v. Watchtower Bible and Tract Society of New York, Inc., the plaintiff alleged that a fiduciary relationship existed between himself and his church because he placed "substantial trust and confidence" in the church and trusted it to protect him. 738 A.2d 839, 847 (Me. 1999). The court refused to find a fiduciary relationship and held that plaintiff's vague, nonspecific allegations were insufficient to establish the existence of a special relationship between himself and his church. Id. The court further held that the plaintiff failed to allege any facts that distinguished his relationship with the church from that of any other members of the church. The court reasoned that creating "an amorphous common law duty" on the part of religious institutions to protect its members would "give rise to 'both unlimited liability and liability out of all proportion to culpability.'" Id. (quoting Cameron v. Pepin, 610 A.2d 279, 283 (Me. 1992)).

The decisions of Doe v. Hartz, Doe v. Norwich Roman Catholic Diocesan Corp., Doe v. Holy See, and Bryan R. v. Watchtower Bible and Tract Society of New York, Inc. demonstrate that a plaintiff cannot rely merely on his status as a parishioner to establish a fiduciary relationship between himself and the diocese. Rather, the plaintiff must show his  relationship with the diocese was somehow unique or distinct from its relationship with other parishioners generally.

> 2. *Cases where the appropriate circumstances for finding the existence of a fiduciary relationship between an individual parishioner and diocese were present.*

Cummins cites several cases where courts found that "appropriate circumstances" existed

to find a fiduciary relationship between a parishioner and clergy member or diocese. While Cummins argues that the facts of these cases support the finding of a fiduciary relationship between himself and the Archdiocese, the cases Cummins relies on are distinguishable.

In <u>Destefano v. Grabrian</u>, 763 P.2d 275 (Col. 1988), the plaintiffs were having marital difficulties and sought marriage counseling from their parish priest. <u>Id</u>. at 278. During the counseling relationship, one of the plaintiffs developed an intimate relationship with the priest. <u>Id</u>. at 279. The priest entered into the relationship knowing that the plaintiff was "extremely vulnerable." <u>Id</u>. The plaintiffs brought claims against the priest and the diocese, but only brought a breach of fiduciary duty claim against the priest, *not against the diocese*. <u>Id</u>. at 282, 289. The district court dismissed the plaintiff's claims pursuant to motions to dismiss filed by the priest and the diocese, and the court of appeals affirmed the dismissal. <u>Id</u> at 279. The Colorado Supreme Court found that the plaintiffs' allegations, if true, were sufficient to establish a fiduciary relationship between the priest and the plaintiffs. <u>Id</u>. at 284. Assuming the plaintiffs' allegations were true, the court found the priest owed fiduciary duty to the plaintiffs, and that such duty was created by his counseling relationship with the plaintiffs. <u>Id</u>. at 284.

In <u>Moses v. Diocese of Colorado</u>, 863 P.2d 310 (Col. 1993), the plaintiff sought counseling from her parish's assistant pastor. <u>Id</u>. at 314. During the counseling relationship, the priest and plaintiff engaged in a sexual relationship. <u>Id</u>. The plaintiff eventually told her husband and sister about the relationship. <u>Id</u>. at 316-17. The plaintiff's husband met with the bishop of the diocese to discuss the relationship. <u>Id</u>. at 317. The bishop assured the plaintiff's husband that he would take control of the matter and do "whatever needed to happen" to resolve the problem. <u>Id</u>. Thereafter, the plaintiff met with the bishop to discuss the relationship, but the bishop took no

further action to assist the plaintiff after the meeting. Id. at 318. Soon after her meeting with the

bishop, the plaintiff's marriage ended in divorce and her mental health deteriorated. Id. The

plaintiff filed a breach of fiduciary duty claim against the bishop and the diocese. Id. At trial, a

jury found the diocese liable for breach of fiduciary duty, and the diocese appealed. Id.

In determining whether a fiduciary relationship existed between the plaintiff and the

bishop or the diocese, the Colorado Supreme Court noted that the "clergy-parishioner

relationship is not necessarily a fiduciary relationship," and that "[a]n unequal relationship does

not automatically create a fiduciary relationship. In order to be liable the superior party must

assume a duty to act in the dependent party's best interest." Id. at 322. The court found that a

fiduciary relationship existed in this case because the bishop knew that the plaintiff was

vulnerable and personally assured the plaintiff and her husband that he would take control of the

situation and resolve the issues created by plaintiff's sexual relationship. Id. at 323. As the bishop

assumed a duty to act in the plaintiff's best interests but failed to do so, the jury's verdict was

supported by record evidence and affirmed by the court. Id.

In F.G. v. MacDonnell, 696 A.2d 697 (N.J. 1997), the plaintiff consulted a pastor,

MacDonnell, for counseling over a period of more than one and a half years. Id at 700. During

the counseling relationship, MacDonnell and the plaintiff engaged in a sexual relationship. Id.

MacDonnell engaged in the relationship even though he knew the plaintiff was vulnerable. Id.

Several years later, after MacDonnell had retired, the plaintiff discussed the relationship with

another pastor, Harper. Id. at 700-01. Without the plaintiff's consent, Harper disclosed the

plaintiff's relationship with MacDonnell to parishioners in an open letter and described details of

the relationship in a sermon. Id. at 701. The plaintiff  brought an action against both MacDonnell

and Harper, *but did not bring an action against the pastors' diocese*. Id. at 700-01. Both pastors

filed motions to dismiss, which were granted by the district court but overturned by the appellate

court. Id. at 700.

On appeal to the New Jersey Supreme Court, the court held the plaintiff could maintain

her breach of fiduciary duty claim against MacDonnell. Id. at 705.  In determining whether the

plaintiff could maintain her claim, the court found that trust and confidence are "vital to the

counseling relationship between parishioner and pastor. By accepting a parishioner for

counseling, a pastor also accepts the responsibility of a fiduciary." Id. at 704. Relying on the

decisions of Destefano and Moses, the court held that a claim for breach of fiduciary duty against

a clergy member "essentially requires proof that a parishioner trusted and sought counseling from

the pastor." Id. As the plaintiff alleged that she trusted and sought counseling from MacDonnell,

she could maintain her action for breach of fiduciary duty against MacDonnell. Id. at 705.

In Doe v. Evans, 814 So.2d 370 (Fla. 2002), the plaintiff alleged claims for breach of

fiduciary duty against a priest (Evans) and the diocese. Id. at 372. The plaintiff was having

marital difficulties, and began seeing Evans for marital counseling. Id. During several months of

counseling, Evans and plaintiff became involved in a romantic relationship. Id. The plaintiff

alleged the diocese was aware of prior incidents of sexual misconduct by Evans. Id. The

plaintiff's breach of fiduciary duty claim against the diocese was based on the theory that,

through its knowledge of prior misconduct, the diocese was aware that Evans was abusing his

position of trust but did nothing to correct the situation. Id. at 372, 374. The district court granted

the diocese's motion to dismiss, and the Florida Court of Appeals affirmed the dismissal. Id. at

372.

On the plaintiff's appeal of the dismissal, the Florida Supreme Court found that the plaintiff's breach of fiduciary duty claims were not barred by the First Amendment and reversed the dismissal of the plaintiff's claims. Id. at 377. The court emphasized that its opinion:

> should not be read as determining the sufficiency of the underlying allegations of the operative complaint. On remand, the plaintiff should have the opportunity to amend the complaint to make more specific and definite the allegations of the underlying behavior complained of, and the Church Defendants should have the opportunity to attack the sufficiency of these allegations consistent with this opinion.

Id. Although the court found that a fiduciary relationship between a diocese and an individual parishioner may arise when the diocese "through its clergy, holds itself out as qualified to engage in marital counseling and a counseling relationship arises...," the court stressed that it was a question for the jury to determine whether a fiduciary relationship actually existed between the plaintiff and Evans or the diocese. Id. at 375. As the court never ruled on the sufficiency of the plaintiff's allegations in support of the finding of a fiduciary relationship, reliance on the opinion for such a purpose would be inappropriate.

The Supreme Court of Mississippi relied on Destefano and Doe v. Hartz to find that whether a fiduciary relationship exists between a parishioner and a priest or diocese depends on factual circumstances. Mabus v. St. James Episcopal Church, 884 So.2d 747, 757 (Miss. 2004). The plaintiff in Mabus had been involved in an extramarital affair, and her husband had arranged a meeting with their pastor to confront her with his knowledge of the affair. Id at 751-52. During the meeting, the pastor met with the plaintiff individually to discuss her infidelity. Id. at 752. The pastor assured the plaintiff that he was there to help her, not ambush her. Id. After the meeting, the pastor told other people about the details of his conversation with the plaintiff. The plaintiff

filed a breach of fiduciary duty claim against the pastor, his church, and the diocese. Id. at 750. The pastor, church, and diocese all filed motions to dismiss, which were denied by the trial court. Id. at 751. The defendants then filed motions for partial summary judgment on the breach of fiduciary duty claims. Id. The trial court granted the motions, and the plaintiff appealed. Id.

On appeal, the Supreme Court recognized that a fiduciary relationship between the plaintiff and the pastor or diocese could exist under appropriate factual circumstances. Id. at 760. However, the plaintiff did not produce any evidence that she was dependent upon or reposed her trust or confidence in the pastor or the diocese, and the meeting between the plaintiff and the pastor did not approach "any reasonable concept of marital counseling." Id. at 761. The court declined to find the existence of a fiduciary relationship between the plaintiff and the pastor or diocese. Id.

Cummins also relies extensively on Fortin v. The Roman Catholic Bishop of Portland 871 A.2d 1208 (Me. 2005), Roman Catholic Diocese of Jackson v. Morrison, 905 So.2d 1213 (Miss.2005), and Martinelli v. Bridgeport Roman Catholic Diocesan Corporation, 196 F.3d 409 (2d Cir. 1999) to further argue that the facts of his case are similar and therefore fit within the category of "appropriate circumstances" which support the finding of a fiduciary relationship.

The plaintiff in Fortin v. The Roman Catholic Bishop of Portland appealed from a judgment dismissing his complaint against a diocese. 871 A.2d 1208, 1212 (Me. 2005). The plaintiff's complaint was predicated on sexual assaults committed by a priest over a seven-year period. Id. Among plaintiff's claims was a claim for breach of fiduciary duty against a diocese. Id. The plaintiff alleged that he was a parochial school student and an altar boy at a parish within the diocese. Id. at 1219. Furthermore, the plaintiff's parents suffered from illnesses that limited

their ability to raise the plaintiff, and the diocese was aware of the plaintiff's situation. Id. The plaintiff also alleged that the diocese knew that the priest who sexually assaulted the plaintiff had a propensity to engage in such conduct. Id. at 1212. The district court dismissed the plaintiff's claim for breach of fiduciary duty upon the diocese's motion to dismiss. Id. at 1213.

On appeal, the Supreme Judicial Court of Maine held that the plaintiff's allegations of a fiduciary relationship were sufficient to overcome the diocese's motion to dismiss. The diocese's acceptance of greater responsibility in raising the plaintiff due to his parents' illnesses, along with his status as a parochial student and altar boy were central in the court's finding that the allegations were sufficient to overcome a motion to dismiss. Id. at 1220.

In Roman Catholic Diocese of Jackson v. Morrison, a priest ("Broussard") became a close and trusted family friend of the Morrison family. 905 So.2d at 1219. Broussard spent "much time" at the Morrison's home as well as their summer lake house. Id. Shortly after developing a relationship with the family, Broussard began sexually assaulting the Morrison's three children. Id. at 1220. After hearing rumors that Broussard had sexually assaulted another child, Dr. Morrison asked two of his children whether Broussard had assaulted them. Id. When the children confirmed the assaults, Dr. Morrison confronted diocesan officials, including the vicar general. Id. The officials assured Dr. Morrison that Broussard was being treated for his problems, and convinced Dr. Morrison to leave resolution of the matter with the diocese. Id. The diocese took no further action against Broussard, and he continued to abuse the Morrison children. Id. The Morrison's filed suit against the diocese and alleged a claim for breach of fiduciary duty. Id. The diocese filed a motion to dismiss and argued that allowing the Morrisons to pursue their claims would excessively entangle the court in religion in violation of the First

Amendment. Id. The trial court denied the diocese's motion to dismiss, and the diocese sought an interlocutory appeal of the denial. Id.

Upon the diocese's interlocutory appeal, the Mississippi Supreme Court affirmed the denial and held that the Morrisons' fiduciary duty claim was not barred by the First Amendment. Id. at 1240. In commenting on the possibility that a fiduciary relationship existed between the dioceses and the Morrisons, the court noted that such a relationship "did not exist merely because Broussard was the Morrisons' priest. However, it may have existed for other reasons. That question is not before us today, and we therefore affirm the decision of the trial court in refusing to dismiss the Morrisons' breach of fiduciary claim on jurisdictional grounds." Id. At 1240.

The plaintiff in Martinelli v. Bridgeport Roman Catholic Diocesan Corporation was a parishioner of, and attended a catholic high school affiliated with, the Bridgeport Diocese. 196 F.3d at 414. Father Brett was an assistant pastor at the plaintiff's church from 1962 until 1964. Id. at 413-14. During his time at the church, Father Brett acted as a mentor and advisor to a small group of young men, including the plaintiff, who were interested in liturgical reforms within the Catholic Church. Id. at 414. The plaintiff filed suit against the Bridgeport Diocese and Father Brett and alleged a claim for breach of fiduciary duty against the diocese. Id. at 416. At trial, a jury found that a fiduciary relationship existed between the plaintiff and the diocese. Id. at 417.

On appeal, the Second Circuit Court of Appeals affirmed the jury's finding of a fiduciary relationship. Id. at 429-30. The court relied on the following facts to find that there was sufficient evidence to support the finding of a fiduciary relationship: 1) the plaintiff attended a diocesan school; 2) the plaintiff had, and the diocese knew he had, a "special and privileged relationship" with Father Brett as a result of his membership in the liturgical reform group; 3) Father Brett

spent more time with the liturgical reform group than with other parishioners; 4) the diocese was aware of the increased contact between Father Brett and the liturgical reform group; and 5) the diocese knew and approved of church field trips where Father Brett took boys including the plaintiff to other cities.  Id. Based on these and other facts, the court held that a jury could have found that the plaintiff had a fiduciary relationship with the diocese. Id. at 430.

       3.     *Summary of legal authority.*

The cases discussed above show that the "appropriate circumstances" for finding the existence of a fiduciary relationship are limited. Such circumstances will be present only when the plaintiff can show that his relationship with the diocese was unique and distinct from the diocese's relationship with its parishioners in general. See Bryan R., 738 A.2d at 847; Doe v. Holy See, 17 A.D.3d at795. Courts have only recognized a unique relationship when the diocese was involved in a counseling relationship with a clergy member, Richelle L., 130 Cal.Rptr.2d at 617, or where the plaintiff placed his or her trust or confidence in the diocese as a result of direct contact or a direct relationship with the diocese.  Moses, 863 P.2d at 323. Appropriate circumstances do not exist merely because the plaintiff was a parishioner within the diocese. See Bryan R., 738 A.2d at 847.

**B.    There Is No Evidence Of A Fiduciary Relationship Between Cummins And The Archdiocese.**

    *1. The Cases On Which Cummins Relies Are Distinguishable.*

When viewed together, the decisions of Destefano, Moses, MacDonnell, Evans, Fortin, Morrison, and Martinelli are not as compelling as Cummins would lead the court to believe. The Destefano, MacDonnell, Evans, Fortin, and Morrison decisions each involve rulings on motions

to dismiss, whereas this court is considering a motion for summary judgment. The standards for dismissal for failure to state a claim are different from the standards for granting summary judgment. Kane v. State of Iowa Dept. of Human Services, 955 F.Supp. 1117, 1121 n. 1 (N.D. Iowa 1997). While a motion for summary judgment is decided on the basis of a factual record, a court reviewing a motion to dismiss will only consider whether the pleadings state a claim upon which relief can be granted. Id. The court's inquiry on a motion to dismiss is not whether the plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support his claims. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). As a result, a party resisting a motion for summary judgment has a greater burden to overcome dismissal of his claims than a party resisting a motion to dismiss. See Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers, 141 F.3d. 71, 76 (3d Cir. 1998)(holding that bare allegations which are sufficient to withstand a motion to dismiss are not enough to withstand a motion for summary judgment). Allegations that are sufficient to withstand a motion to dismiss are not enough to withstand a motion for summary judgment. Id. As the decisions of Destefano, MacDonnell, Evans, Fortin, and Morrison  were rulings on motions to dismiss, this court should appropriately limit its consideration and application of the facts alleged in those cases. Although the facts alleged in the cases were sufficient to state a claim for breach of fiduciary duty, it is unclear whether any of the facts alleged were sufficient to withstand a motion for summary judgment.

Furthermore, the common holding of Destefano, MacDonnell, and Evans--that the "appropriate circumstances" for imposing a fiduciary relationship on a clergy member will exist only when a troubled or vulnerable parishioner enters into a counseling relationship with the clergy member--is not applicable to the facts of this case. See Richelle L. v. Roman Catholic

<u>Archbishop</u> 130 Cal.Rptr.2d 601, 617 (Cal. Ct. App. 2003)(citing <u>Doe v. Evans</u>, <u>F.G. v. MacDonnell</u>, and <u>Destefano v. Grabrian</u> and noting "It is telling that the cases imposing a fiduciary duty on a pastor for sexual misconduct that breached a confidential relation all involved situations in which the pastor was providing the parishioner marital, family, or financial counseling."). Cummins has never alleged, nor is there any evidence that he was ever involved in a counseling relationship with either Father Peters or Father Roach. Cummins has only indicated that he viewed Father Roach as a "spiritual advisor." <u>See</u> Plaintiff's Appendix at 94.

Mr. Doyle now asserts that Cummins relied on Father Roach as a "spiritual counselor," and claims that the role of a spiritual counselor is "more profound" than that of an ordinary counselor. <u>See</u> Plaintiff's Supp. App. at 8. Mr. Doyle provides no details to support either of his assertions, and there is no evidence that Cummins ever had any spiritual counseling sessions with Father Roach. Mr. Doyle fails to explain how Father Roach's role as a "spiritual counselor" was any different from his role as a priest. In fact, Mr. Doyle cites to Canons 212 and 213, which provides that parishioners should discuss their spiritual needs with the clergy, and have a right to spiritual assistance from the clergy. <u>See</u> Plaintiff's Supp. App. at 6. These Canons suggest that Father Roach was a "spiritual counselor" to *all* parishioners, not just Cummins. As discussed above, a fiduciary relationship may not be based solely on a plaintiff's status as a parishioner. <u>See</u> <u>Doe v. Holy See</u>, 17A.D.3d at 795; <u>Bryan R.</u>, 738 A.2d at 847. Cummins must distinguish his relationship from that of other parishioners to establish that a fiduciary relationship existed. <u>See</u> <u>Doe v. Holy See</u>, 17A.D.3d at 795; <u>Bryan R.</u>, 738 A.2d at 847.

The few cases that have conclusively established the existence of a fiduciary relationship between a diocese and a parishioner are distinguishable. In <u>Moses</u>, the Colorado Supreme Court

found that such a relationship existed because the diocese, through its bishop, personally assured the parishioner that it would assume control of a situation and act in the parishioner's best interests. See Moses, 863 P.2d at 322-23. Unlike the parishioner in Moses, Cummins has not alleged or produced any evidence that the Archdiocese or the archbishop ever told or assured Cummins that it would assume control of the situation and act to resolve any problems caused by the conduct of Father Roach or Father Peters.

In Martinelli there was evidence that the plaintiff was a member of a special group that met regularly and was mentored by a priest, and that the diocese was aware of the plaintiff's involvement in the group. 196 F.3d at 429-30. There is no evidence, nor has Cummins alleged, that the Archdiocese had any knowledge of his status as a summer employee of Immaculate Conception Church, or that he worked for and with Father Roach. Based on the legal authority Cummins cites, he has not alleged the appropriate circumstances to support the existence of a fiduciary relationship between himself and the Archdiocese.

2.      *Cummins Has Not Alleged The "Appropriate Circumstances" Necessary To Find The Existence Of A Fiduciary Relationship.*

According to the decision in Doe v. Hartz, Iowa law will only recognize a fiduciary relationship between an individual parishioner and a diocese in appropriate circumstances. 52 F.Supp.2d at 1059. Based on the legal authority discussed above, Cummins has not alleged the "appropriate circumstances" necessary to find the existence of a fiduciary relationship between himself and the Archdiocese. As discussed in section I.B.1 above and incorporated by reference herein, Cummins has produced no evidence, nor has he alleged, that he was ever involved in a counseling relationship with Father Roach or Father Peters. Cummins has not distinguished his

"spiritual counseling" relationship with Father Roach from Father Roach's "spiritual counseling" relationship with other parishioners and cannot establish a fiduciary relationship on the basis of "spiritual counseling." <u>See</u> <u>Doe v. Holy See</u>, 17A.D.3d at 795; <u>Bryan R.</u>, 738 A.2d at 847.

Cummins has not produced any evidence showing he had direct contact or a direct relationship with the Archdiocese, or that he ever placed his trust or confidence in the Archdiocese as a result of direct contact or a direct relationship. Mr. Doyle provides a number of vague statements about Cummins' relationship with the Archdiocese based on his status as a parishioner. He claims Cummins was obligated to support the Archdiocese financially and obey the archbishop. <u>See</u> Plaintiff's Supp. App. at 5. Mr. Doyle claims Cummins was trained to trust clergy members, and that his relationship with the archbishop was "based on trust." <u>See</u> Plaintiff's Supp. App. at 8. Mr. Doyle states that the source of Cummins' various duties is Canon law. <u>See</u> Plaintiff's Supp. App. at 5. Mr. Doyle's assertions are nothing more than generalized statements about the nature of the Archdiocese's relationship with all of its parishioners. Mr. Doyle's assertions do not set forth any unique facts or circumstances that distinguish Cummins' relationship with the Archdiocese from its relationship with any other parishioner, and are not sufficient to support a finding of a fiduciary relationship. <u>See</u> <u>Doe v. Holy See</u>, 17A.D.3d at 795; <u>Bryan R.</u>, 738 A.2d at 847. Mr. Doyle further claims the Archdiocese is ultimately responsible for protecting all parishioners within its 30 counties and 17,000 square miles from harm caused by other members of the diocese. Mr. Doyle's conclusion that the Archdiocese, through its status within the church hierarchy, has an automatic fiduciary duty to protect any and all members of the diocese from harm is contrary to the great weight of legal authority. <u>See</u> <u>Doe v. Hartz</u>, 52 F.Supp.2d at 1064 (holding that the mere status of the diocese within the church hierarchy is an

insufficient basis for asserting a fiduciary duty);  Doe v. Holy See, 17 A.D.3d at 795 (holding that

plaintiff may not rely on church's status in general to establish fiduciary relationship); Bryan R.,

738 A.2d at 847 (refusing to create fiduciary duty on part of religious institutions to protect

members).

Cummins further argues that the appropriate circumstances for finding a fiduciary

relationship existed because of his status as an altar boy, parochial student, and parish employee.

See Plaintiff's Supplemental Appendix at 8. Cummins compares his status to those of the

plaintiffs in Fortin, Morrison, and Martinelli to argue that a jury question is generated as to

whether a fiduciary relationship existed. As discussed above, Fortin and Morrison were decisions

on motions to dismiss and did not determine whether the plaintiffs' allegations of fiduciary

relationships were sufficient to withstand a motion for summary judgment. It would be incorrect

for this court to rely on the alleged facts of Fortin or Morrison to find that a fiduciary relationship

existed between the Archdiocese and Cummins.

Even if the alleged facts of Fortin and Morrison are considered, those facts are

distinguishable from Cummins' case. Unlike the plaintiff in Fortin, Cummins has not alleged,

nor is there any evidence, that his parents were limited in their ability to raise him, or that the

Archdiocese assumed the responsibility of raising him. While the plaintiffs in Morrison alleged

that the priest was a close and trusted family friend who spent a large amount of time at their

family home, Cummins has not alleged, nor is there any evidence, that Father Roach or Father

Peters were close and trusted family friends, or that either man spent large amounts of time with

his family. The Morrison plaintiffs also alleged that the diocese, through its bishop, assured the

plaintiffs that it would take control of the situation, but Cummins has not alleged, nor is there any

evidence, that the Archdiocese or the archbishop had direct contact with, or made such an assurance to Cummins. Finally, whereas in Martinelli there was evidence that the plaintiff was a member of a special group that met regularly and was mentored by a priest, and that the diocese was aware of the plaintiff's involvement in the group, there is no evidence, nor has Cummins alleged, that the Archdiocese had any knowledge of his status as a parish employee or that he worked for and with Father Roach.

In summary, Cummins has never alleged that he was involved in a counseling relationship with Father Roach or Father Peters. Cummins has never alleged, nor is there any evidence that he had any direct contact with the Archdiocese. See Supplemental Appendix at 4; Affidavit of Monsignor James O. Barta. Cummins did not allege, nor is there any evidence, that he ever placed his confidence, trust, or reliance upon the judgment or guidance of the Archdiocese as a result of direct contact or a direct relationship with the Archdiocese. Cummins has not alleged, nor is there any evidence, that he was dependent on the Archdiocese, or that the Archdiocese ever acted on his behalf or exercised influence over him. See Supplemental Appendix at 4; Affidavit of Monsignor James O. Barta. Cummins has not alleged or produced any evidence of the appropriate circumstances necessary to find the existence of a fiduciary relationship between himself and the Archdiocese. See Doe v. Hartz, 52 F.Supp.2d at 1064 (holding appropriate circumstances for recognizing a fiduciary relationship between the plaintiff and a diocese were not present where there was no evidence of direct contact between the plaintiff and the diocese); Moses, 863 P.2d at 323 (holding a fiduciary relationship existed because the diocese assumed control and personally assured the plaintiff it would resolve the situation); Richelle L., 130 Cal.Rptr.2d at 617 (holding that appropriate circumstance to support

the existence of fiduciary relationship are present only when the parishioner enters into a

counseling relationship with a clergy member). Therefore, the Archdiocese is entitled to

summary judgment as a matter of law on Cummins' claim for breach of fiduciary duty.

## II. THE ARCHDIOCESE CANNOT BE HELD LIABLE FOR NEGLIGENT HIRING, RETENTION, SUPERVISION, DOCUMENTING, AND/OR WARNING.

### A. Cummins' Claims For Negligent Hiring, Retention, Supervision, And Documenting Are Barred By The First Amendment And Article I, Section 3 Of The Iowa Constitution.

Count V of Cummins' amended complaint alleges claims for negligent hiring, retention,

supervision, and documenting against the Archdiocese. See Amended Complaint, Count V. As

Cummins has acknowledged, the religion clauses of the First Amendment and Article I, Section

3 of the Iowa Constitution preclude courts from interfering in purely ecclesiastical matters.

See Marks v. Estate of Hartgerink, 528 N.W.2d 539, 544 (Iowa 1995). Cummins argues that his

claims are not barred because they do not involve purely ecclesiastical matters and do not require

the court to interpret church doctrine to determine liability. This argument is without merit and

not supported by the weight of authority.

Cummins' claim for negligent hiring requires the court to determine whether Father

Roach and Father Peters were fit to serve as Catholic priests. See  Godar v. Edwards, 588

N.W.2d 701, 708-709 (Iowa 1999)(stating the elements of a negligent hiring claim). Any

determination of the qualifications or fitness of a Catholic priest will "require interpretation of

church canons and internal church policies and practices." Pritzlaff, 533 N.W.2d at 790; see also,

Ayon v. Gourley, 47 F.Supp.2d 1246, 1250 (D. Col. 1998)(finding that consideration of church

hiring policies would inevitably require examination of church policy and doctrine). It is well

established that the First Amendment prohibits courts from determining the qualifications of clergy members. See Gonzalez v. Roman Catholic Archbishop of Manila, 280 U.S.1, 16 (1929)(holding that the selection of clergy is a canonical act, and that it is the function of church authorities to determine the qualifications of a member of the clergy); Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church, 344 U.S. 94, 116 (1952) (stating that freedom to select clergy is constitutionally protected from state interference by the free exercise clause); Pritzlaff v. Archdiocese of Milwaukee, 533 N.W.2d 780, 790 (Wis. 1995)(holding that First Amendment prevents courts from determining what makes one competent to serve as a Catholic priest). Court interference with the process by which clergy are chosen would encroach upon a church's free exercise and practice of its religion and would cause excessive entanglement by "fostering inappropriate government involvement" with religion. Ayon, 47 F.Supp.2d at 1250; Isely v. Capuchin Province, 880 F.Supp. 1138, 1150-51 (E.D. Mich. 1995)(dismissing plaintiff's negligent hiring claim because any inquiry into the decisions behind the hiring of a priest would involve excessive entanglement with religion). As Cummins' claim for negligent hiring requires the court to determine whether Father Roach and Father Peters were qualified to serve as priests in violation of the First Amendment, the claim must be dismissed.

Cummins' claims for negligent retention, supervision, and documenting require the court to determine the continuing fitness of Father Roach and Father Peters as Catholic priests and the duty of care owed by the Archdiocese (and *all* other religious organizations) in retaining and supervising clergy members. See Estate of Harris v. Papa John's Pizza, 679 N.W.2d 673, 680 (Iowa 2004)(stating elements of negligent supervision claim); Stricker v. Cessford Construction Company, 179 F.Supp.2d 987, 1019 (N.D. Iowa 2001)(stating elements of negligent retention

and supervision claims). The First Amendment prohibits courts from determining the qualifications of clergy members, <u>Gonzalez</u>, 280 U.S. at 16, or from creating a standard of reasonable care for religious organizations. <u>Ehrens v. The Lutheran Church-Missouri Synod</u>, 269 F.Supp.2d 328, 332 (S.D.N.Y.2003). As the <u>Ehrens</u> court noted, any effort by a court to determine the duty of care by which a church should supervise its clergy:

> would of necessity require the court . . . to consider the fundamental perspective and approach to ordination and supervision of clergy and constituent churches inherent in the beliefs and practices of the particular denomination. . . . The mainstream denominations differ greatly in their rules and policies for "calling" and removing clergy. For a court to intervene to set standards of care for the performance of this work, which is founded in scripture and in history, implicating apostolic succession in some denominations, is as unconstitutional as it is impossible. When such intervention is directed to retention, the problem becomes worse . . . ."

<u>Id</u>. at 333; <u>see</u> <u>also</u> <u>Mabus v. St. James Episcopal Church</u>, 884 So.2d 747, 764 (Miss.2004)(finding that plaintiff's claims for negligent supervision and retention would excessively entangle the court with religious matters). Furthermore, any award of damages against a religious organization for negligent hiring, retention, or supervision "would have a chilling effect, leading indirectly to state control over the future conduct of affairs of a religious denomination, a result violative of the text and history of the establishment clause." <u>Id</u>.

Cummins relies on the affidavit of Mr. Doyle to argue that his claims are not constitutionally barred. Mr. Doyle's qualifications as a legal or constitutional expert are unclear. Although Mr. Doyle may have some expertise in the area of Canon law, he is not qualified to provide constitutional interpretations on the interplay of canon and constitutional law.

Furthermore, although Mr. Doyle's assertion that canon law does not "trump" civil or criminal law is correct, it is irrelevant and misses the point of the Archdiocese's argument. The

Archdiocese is not arguing that it is exempt from liability because it followed canon law in this case. Rather, the Archdiocese asserts that Cummins' claims under Count V of his Complaint will require the court to review policies and procedures of the Catholic Church and determine whether its policies for hiring, retaining, and supervising clergy members are "reasonable" when compared to a secular standard of care. The policies and procedures of the Catholic Church are rooted in religious belief, they define the Catholic Church, and they distinguish it from other denominations. Court intervention in the Archdiocese's decisions to hire, retain, or supervise priests or other clergy members would constitute an excessive entanglement with religion and is prohibited by the First Amendment. See Gonzalez, 280 U.S. at 16; Kedroff, 344 U.S. at 116; Ayon, 47 F.Supp.2d at 1250; Ehrens, 269 F.Supp.2d at 332.

**B.    The Archdiocese Had No Duty To Warn Cummins Or Other Parishioners Of The Alleged Prior Misconduct Of Father Roach and Father Peters.**

As Cummins does not raise any new issues in his Resistance regarding his "duty to warn" claim, the Archdiocese incorporates by reference the arguments made in its Supplemental Motion for Summary Judgment. In addition, the Archdiocese reiterates that there is no record evidence that the Archdiocese had actual knowledge before the summer of 1962 that Father Peters or Father Roach ever engaged in sexual misconduct with others. The Archdiocese is entitled to summary judgment on Cummins duty to warn claim for the reasons stated in its Motion and Supplemental Motion for Summary Judgment.

**III.    THERE IS NO EVIDENCE TO SUPPORT CUMMINS' CLAIM FOR CIVIL CONSPIRACY.**

Count VI of Cummins' amended complaint alleges a claim of civil conspiracy against the Archdiocese. The principal element of a civil conspiracy claim is the existence of "an agreement

or understanding to effect a wrong against another." Tubbs v. United Central Bank, N.A., 451 N.W.2d 177, 184 (Iowa 1990). The agreement "must involve some mutual mental action coupled with an intent to commit the act that causes injury." Ezzone v. Riccardi, 525 N.W.2d 388, 398 (Iowa 1994).

In this case, there is no evidence of any agreement between the Archdiocese, Father Peters, and Father Roach to commit assaults upon Cummins or any other parishioner. Without evidence of an agreement, Cummins' claim for conspiracy must be dismissed. See Ezzone, 525 N.W.2d at 398 (stating that, for civil conspiracy, an agreement between two or more persons to commit a wrong against another must exist); Smith v. O'Connell, 997 F.Supp. 226, 241 (D. R.I. 1998)(dismissing plaintiffs' civil conspiracy claims against diocese because there were no facts from which the existence of an agreement could be inferred). Cummins attempts to argue that an agreement to commit the assaults existed because the Archdiocese's allegedly knew of prior misconduct by Father Roach and Father Peters. However, such knowledge does not qualify or meet the "mutual mental action" requirement of Ezzone. 525 N.W.2d at 398. Without any evidence of an agreement to commit the assaults between the Archdiocese and Father Roach and Father Peters, the Archdiocese is entitled to summary judgment on Cummins claim for civil conspiracy. See Ezzone, 525 N.W.2d at 398; Smith v. O'Connell, 997 F.Supp. at 241.

The other essential element upon which liability for civil conspiracy is predicated is an act causing injury which is actionable and undertaken in furtherance of the conspiracy. Doe v. Baxter Healthcare Corporation, 380 F.3d 399, 410 (8th Cir. 2004). Cummins alleges eight different acts which he claims were taken in furtherance of the conspiracy to commit assaults against him. Cummins has failed to provide evidence supporting his allegations. Cummins has

produced no evidence showing the Archdiocese had knowledge regarding prior sexual misconduct by Father Peters or Father Roach. Cummins has not shown how the alleged actions of Raymond Roseliep and Albert Manternach are attributable to the Archdiocese. There is no evidence that Archbishop Byrne ever received a letter regarding Father Roach following Loras College's graduation in 1962, nor is there any evidence that he permitted or directed Father Roach to supervise young men, take them on trips, or use the Archdiocese's property for such trips.

Furthermore, the acts which Cummins alleges were in furtherance of the conspiracy did not cause injury to Cummins and are not actionable. The acts causing injury to Cummins were the alleged assaults committed by Father Roach and Father Peters. It is not sufficient to argue that the Archdiocese's alleged acquisition of knowledge regarding prior misconduct of Father Roach and Father Peters caused an injury to Cummins. It would be equally inadequate to argue that any of the other alleged acts in furtherance of the conspiracy caused injury to Cummins or were, in and of themselves, actionable wrongs. As Cummins fails to establish any of the elements necessary for a civil conspiracy claim, the Archdiocese's motion for summary judgment on Count VI of Cummins' complaint should be granted.

## CONCLUSION

For the foregoing reasons, Defendant, The Archdiocese of Dubuque, respectfully requests that this court grant summary judgment and dismiss Cummins' claims with prejudice and costs and for such other relief, legal or equitable, as this court deems just and appropriate.

THE ARCHDIOCESE OF DUBUQUE,
Defendant

By _/s/ Brendan T. Quann_____
    Brendan T. Quann     000004440

By _/s/ Davin C. Curtiss_____
    Davin C. Curtiss     000014786

Mailing Address:
O'CONNOR & THOMAS, P.C.
P. O. Box 599
Dubuque, IA  52004-0599

Physical Address:
O'CONNOR & THOMAS, P.C.
Dubuque Building
700 Locust Street, Ste. 200
Dubuque, IA 52001-6874

Telephone:  (563) 557-8400
Facsimile:  (563) 556-1867
E-mail: bquann@octhomaslaw.com
       dcurtiss@octhomaslaw.com

Attorneys for said Defendant.

Copy via electronic service to:

Attorneys Thomas L. Staack and
    Chad A. Swanson
Dutton, Braun, Staack, & Hellman, P.L.C.
3151 Brockway Road
P.O. Box 810
Waterloo, IA 50704